# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 16, 2013 Session

## STATE OF TENNESSEE v. BOBBY STANLEY GEORGE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2188      Monte Watkins, Judge**

---

**No. M2012-01542-CCA-R3-CD - Filed August 26, 2013**

---

Appellant, Bobby Stanley George, was indicted by a Davidson County grand jury for attempted especially aggravated kidnapping; driving while under the influence of an intoxicant ("DUI"), fourth offense; and driving with a revoked license. At trial, he was found guilty of all counts. The trial court sentenced him to eleven years, two years, and six months, respectively, with all sentences to be served concurrently. Following the denial of his motion for a new trial, appellant argues in this appeal that: (1) there was insufficient evidence to support the conviction for attempted especially aggravated kidnapping; (2) the trial court erred in instructing the jury on involuntary intoxication; and (3) the trial court erred in sentencing him to eleven years for attempted especially aggravated kidnapping. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

C. Edward Fowlkes, Nashville, Tennessee, for the appellant, Bobby Stanley George.

Robert E. Cooper, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

#### A. Facts from Trial

This case involves the attempted especially aggravated kidnapping of an eight-year old boy. The State called R.M.[1] as its first witness. R.M. testified that on March 31, 2009, his family was dining at a Hooters restaurant on Lebanon Road in Nashville, Tennessee. He and his younger brother M.M. walked outside to take leftovers from dinner to his truck. As they were walking back toward the restaurant, a vehicle driven by a man whom he did not know, later identified as appellant, approached them. Appellant exited the vehicle and began to talk to them. Appellant offered R.M. and M.M. "money or popsicles" if they would take a ride in his car with him. R.M. responded, "'No, sir,'" and "'No, thank you,'" to appellant. Appellant then grabbed M.M. and picked him up. R.M. in turn grabbed M.M. and pulled him out of appellant's grasp. R.M. instructed M.M. to run inside the restaurant. R.M. then proceeded to walk toward the restaurant, but as he looked back, he noticed appellant following them. R.M. immediately found his father and relayed the occurrence. Appellant continued to walk into the building and sat down a couple of booths away from R.M. and his family. R.M.'s father told the manager what had happened, and the manager called 9-1-1. R.M.'s mother also called 9-1-1. After remaining seated in the restaurant for several minutes, appellant exited the restaurant and left in the same vehicle in which he arrived. R.M. described the vehicle to his mother as an older model gold Cadillac DeVille, and his father obtained the tag number from the vehicle.

When the police arrived, R.M. recounted the occurrence. Soon thereafter, a female officer escorted R.M. and his mother approximately one mile down Lebanon Road to identify appellant. When they arrived, appellant was standing outside of his vehicle and was handcuffed. R.M. recognized appellant as being the same man who accosted him and M.M. in the parking lot of Hooters. He identified appellant for the record at trial.

On cross-examination, R.M. stated that the occurrence happened at night, at 8:45 to 9:00 p.m. He also recalled that when appellant spoke to them, he had difficulty understanding him because his speech was slurred. He also noted that appellant was not walking very well. R.M. added that after he freed M.M. from appellant's grasp and walked

_____

[1] This case involves a minor victim, M.M. It is the policy of this court to protect the identity of minor victims; thus, to identify the older brother, who was an adult at the time of trial, or their parents by name would be to identify, by reference, the younger victim. Accordingly, we refer to the victim, his older brother, and their parents by their initials only.

away, appellant called out to him, "'Let's go inside and drink.'" R.M. denied that appellant removed a "wad of money" from his pocket and displayed it, and he denied having told the responding officer that had occurred. He confirmed that there were patrons seated in the patio area of the restaurant, which was twenty to twenty-five feet away, and that the parking lot was "mostly" full of vehicles.

M.M., who was eight years old at the time of this offense, was the State's next witness. He testified that his family was at Hooters for "writer's night," which was a venue for people to perform their music for others. He stated that when he and R.M. left to go to R.M.'s truck, appellant pulled up in his vehicle and tried to "pick [him] up." M.M. had never seen appellant before. He recalled that appellant drove a Cadillac and pulled to within three or four feet of them. Appellant asked if M.M. wanted some candy. He explained that by "pick him up," he meant that appellant tried to pick him up by the waist. Appellant grabbed him and held him for approximately five seconds before R.M. hit appellant in the face and secured his release. R.M. then instructed M.M. to go into the restaurant and tell their parents what had happened. M.M. testified that appellant followed them inside after he got away from appellant.

M.M. stated that his parents called the police and that while his mother was on the telephone with the police, appellant left the building, entered his vehicle, and drove away. Officers responded to the restaurant, and R.M. and their mother told the police what had occurred. He did not go to the secondary scene. M.M. identified appellant in court for the record.

The State next called J.M., the mother of R.M. and M.M., who testified that because her husband, D.M., is a musician, they attended writer's night at Hooters. After they finished their meal, D.M. was talking with some other musicians. R.M. and M.M. asked if they could take the to-go box to the truck, and she responded, "'Yes, you stay together.'" While R.M. and M.M. were outside, R.M.'s girlfriend approached her and told her that there was "something going on." J.M. walked toward the door as R.M. and M.M. were entering. As M.M. was trying to explain what had occurred, she saw appellant enter the restaurant behind R.M. and sit down at a table in close vicinity to where they were seated. She had never seen appellant before.

J.M. explained that she turned her attention to R.M. for an explanation of the events. J.M., in turn, repeated the event to D.M., who went outside to obtain appellant's tag number while J.M. located the Hooters manager. She then called 9-1-1 and relayed the tag number and vehicle model information to the operator. Before she placed the 9-1-1 call, appellant left the building. J.M. identified appellant in the courtroom at trial.

On cross-examination, J.M. stated that when appellant entered Hooters, she noticed that he appeared to be intoxicated. She said that a waitress approached him, but she could not hear the conversation. In addition, no one ever brought appellant anything to eat or drink.

Officer Sandra Delbosco, an officer with the Metro-Nashville Police Department, testified that she was a patrol officer when this event occurred. She was dispatched to Hooters on Lebanon Road on March 31, 2009, around 9:00 p.m. to respond to a call involving a possible kidnapping. When she arrived at Hooters, some of the family members and Hooters management personnel were waiting outside to speak with her. She spoke with R.M., M.M., and their parents. They described appellant to her, gave a description of his vehicle, and provided his tag number. She provided the information to the dispatcher, and Officers Andrew Vallee and Kristopher Mason stopped appellant's vehicle in close proximity to Hooters within minutes of her calling in the information. She asked R.M. and his mother to accompany her to the secondary location for a "show-up," which is an encounter that occurs when police have a suspect and within a reasonable amount of time after the crime, the victim can view the suspect without being seen by the suspect. A detective continued the investigation, and she had no further involvement. Officer Delbosco identified appellant seated in the courtroom at the trial.

On cross-examination, Officer Delbosco acknowledged that her incident report did not mention that appellant had physically picked up M.M. She also stated that one of the victims made a statement about appellant's removing a "wad of money" from his pocket and displaying it to them.

Officer Kristopher Mason, an officer with the Metro-Nashville Police Department, also testified with regard to the occurrence. He stated that he and Officer Vallee were dispatched to Hooters on March 31, 2009. They received information pertaining to appellant's vehicle and encountered the vehicle on the way to Hooters. Officer Mason was driving the patrol car and initiated a traffic stop based on the description and tag information provided for appellant's vehicle. Appellant pulled his vehicle into a Captain D's parking lot. Appellant was very slow to bring his vehicle to a stop, and after he stopped, appellant began backing his vehicle toward the patrol car. Officer Mason had to place the patrol car in reverse to avoid being struck by appellant's vehicle. He honked his horn and sounded the siren to get appellant's attention so he would stop his vehicle.

Officer Mason testified that he and Officer Vallee exited their patrol car. Officer Mason approached the driver's side of the vehicle. Before he reached the vehicle, appellant became "extremely belligerent." He used profane language, and upon observation, Officer Mason noted that appellant's eyes were bloodshot and watery. His speech was slurred; he was unresponsive to verbal commands; and he appeared intoxicated. Appellant could not

open his vehicle's door when asked to exit. Officer Mason tried to explain to appellant that the door was locked and that he had to unlock it first. He recalled that the vehicle was an older model Cadillac that had automatic window and door locks. Appellant kept rolling the window up and down, thinking that it was the door lock. Officer Mason eventually reached through the window and pulled on the knob to unlock the door for him and then opened it.

Appellant exited the vehicle and was very unsteady on his feet. Officer Mason testified that he thought appellant was going to fall. He asked appellant how much he had to drink, but Officer Mason said that appellant's answers were incoherent. Appellant kept talking about his military service in Vietnam and was offended that a police officer "was messing with a war veteran, as he deemed it." They attempted to administer field sobriety tests to appellant, but he was too belligerent to complete them. Based on the level of suspected intoxication, Officer Mason radioed for a DUI officer to respond, and Officer Shawn Taylor arrived at the scene. Officer Mason did not respond to the scene at Hooters or have any contact with the victim or his family. He identified appellant for the jury in court.

On cross-examination, Officer Mason stated that appellant evinced an angry, insulting, and uncooperative demeanor toward him. He further characterized appellant as "stuperous."

Officer Shawn Taylor with the Metro-Nashville Police Department testified that he was assigned to the DUI enforcement unit in March 2009. He responded to the call involving appellant's vehicle at a Captain D's parking lot on Lebanon Road. When he arrived, appellant was in custody and was seated in the patrol car. He questioned appellant about how much he had to drink, and appellant stated that he had not consumed any alcohol that evening. However, when he spoke, Officer Taylor smelled a strong odor of alcohol emanating from appellant's breath, and his speech was slurred. Officer Taylor removed appellant from the vehicle to perform field sobriety tests. Appellant refused and stated, "'Just give me a blood test.'" Officer Taylor testified that he believed appellant "was definitely under the influence" of alcohol. He read appellant the implied consent law, and appellant again agreed to a blood test. He transported appellant to the Nashville General Hospital at Meharry where his blood was drawn and eventually sent to the Tennessee Bureau of Investigation ("TBI") for testing. Appellant was then taken to the Criminal Justice Center for processing. Officer Taylor also indicated that when he checked appellant's driver's license, he learned that his license had been revoked.

Special Agent John Harrison, a forensic toxicologist with the TBI, testified next. He tested appellant's blood sample and stated that appellant's blood alcohol level was 0.24, which was three times the legal limit. On cross-examination, Special Agent Harrison opined that if a subject is in the "elimination" phase after having consumed alcohol, he would expect

the blood alcohol percentage to decrease by 0.02 per hour. Following this testimony, the State rested its case-in-chief.

Appellant called Eric Bauder as his first witness. Officer Bauder was the processing manager for the Davidson County Sheriff's Department and keeper of records for the property room. He reviewed the property receipt that was issued to appellant when he was processed into the jail and confirmed that the form did not indicate that appellant had any money when he was processed.

Appellant next offered Bob Lyons, a retired officer from the Metro-Nashville Police Department with thirty-two years' experience, as an expert in police report writing, and the trial court accepted him as such. He testified with regard to the importance of the initial police report and stated that it is "super, super important" because an officer would receive information from witnesses before it could be "corrupted." He stated that proper procedure would be to separate the witnesses so that they do not influence each other's report. When witnesses are not separated, the dominant person's view usually prevails, and others integrate "bits and pieces" of that person's account into their own report. He also stated that if an officer needed to change an initial report, he or she would file a supplemental report.

Officer Lyons explained that the reason the "132 report" completed by Officer Taylor contains boxes for check marks is that it is easier for the officer to observe an individual who had been stopped and record his recollections without diverting attention from the individual. Officer Lyons clarified that the term "stuperous" as used on the report form meant "someone who is acting lethargic or . . . someone very drunk. . . unable to talk, slurred speech, . . . someone who really can't function properly. . . ."

On cross-examination, Officer Lyons acknowledged that the report would not reflect a "specific, line-by-line recount of every event." He also admitted that he did not review the 9-1-1 recording, which would have preceded the witnesses' statement at the scene. Following Officer Lyons' testimony, the defense rested.

The jury found appellant guilty of the attempted especially aggravated kidnapping of M.M., DUI,[2] and driving with a revoked license.

## B. Facts from Sentencing

At the sentencing hearing, the State called Michael Cordine as its first witness. He was employed by the Metro Criminal Courts as one of the surveillance officers for the

---

[2] Appellant conceded that it was his fourth offense or more.

electronic monitoring program. He testified that while the instant case was pending, appellant was released from custody and was electronically monitored via an ankle bracelet. Appellant accrued several minor violations during his time in the program, including failing to charge the tracking device, failing to keep a schedule, arriving at office visits in an untimely fashion, and failing to pay fees. However, in August 2010, appellant removed his electronic monitor and absconded. Upon receiving notice of this occurrence, Mr. Cordine traveled to the hotel where appellant had been staying and found the monitor on the bed. The ankle monitor had been cut away from the transmitter.

The State also offered judgments for appellant's prior DUI convictions into evidence, as well as a judgment reflecting that appellant was on probation at the time he committed the offenses in the instant case.

Appellant testified on his own behalf and stated that on the day of the offenses, he drove to Nashville to report a stolen automobile. After meeting with an officer at the hotel where he was staying, he walked to a bar that was close by and began drinking tequila. He drank alcohol during most of the day. Appellant testified that he did not remember much of the occurrence at Hooters. He stated, "When I got to the Hooters[,] I was pretty well drunk. I was intoxicated." He recalled pulling into the handicap parking space and going into Hooters. He apologized for anything else that he might have done. He also did not recall any details of the traffic stop leading to his DUI arrest.

Appellant said that he was sixty-four years old and that he began drinking alcohol when he was approximately fifteen years old. He "worked off and on" during his lifetime but stated that drinking always interfered with his job. At the time of the sentencing hearing, appellant received disability payments for post-traumatic stress disorder ("PTSD"). He stated that he was diagnosed with PTSD as a result of his service in Vietnam. He said that he was prescribed medication and that he was supposed to follow up with his doctor every three months to receive refills and further treatment.

Appellant explained that he was familiar with Operation Stand Down, a program through the Department of Veterans Affairs that assisted veterans who suffered from PTSD or other mental disabilities. He stated that the program would be very helpful to him. He claimed that he never got into trouble when he was sober and that he needed rehabilitation. He had been sober for two separate one-year periods, both of which occurred during a term of incarceration.

With regard to the offenses, appellant said that he did not remember and that he did not understand. He stated that he occasionally suffered blackouts and would not recall what happened. He said that he received the bronze star in 2007 for his service in Vietnam.

Following arguments of counsel, the trial court reviewed appellant's prior convictions for DUI and found that it was at least his fourth offense and that appellant had additional convictions to establish enhancement factor (1). *See* Tenn. Code Ann. § 40-35-114(1). It also determined that appellant had previously failed to comply with the conditions of a sentence involving release into the community and that appellant was on probation at the time he committed the offenses in the instant case. *See id*. § 40-35-114(8), (13)(C). The trial court further stated that confinement was necessary to avoid depreciating the seriousness of appellant's conduct and was particularly suited to provide an effective deterrence to others likely to commit similar offenses. *See* Tenn. Code Ann. § 40-35-103(1)(B).

The trial court sentenced appellant as a Range I standard offender to eleven years for the attempted especially aggravated kidnapping conviction; two years for the DUI, fourth offense, conviction; and six months for the driving with a revoked license conviction, with all sentences to be served concurrently with each other. The trial court denied appellant's motion for a new trial. This appeal follows.

## II. Analysis

### A. Sufficiency of the Evidence Supporting the Conviction for Attempted Especially Aggravated Kidnapping

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.

1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The trial court instructed the jury that to sustain a conviction for attempted especially aggravated kidnapping, the State must prove the following elements beyond a reasonable doubt:

(1) that [appellant] intended to commit the specific offense of Especially Aggravated Kidnapping; and

(2) that [appellant] did some act intending to complete a course of action that would constitute Especially Aggravated Kidnapping under the circumstances, as [appellant] believed them to be at the time, and his actions constituted a substantial step toward the commission of Especially Aggravated Kidnapping. Appellant's actions do not constitute a substantial step unless [his] entire course of action clearly shows his intent to commit Especially Aggravated Kidnapping.

The elements of especially aggravated kidnapping, as charged in this case, are that appellant "knowingly remove[d] or confine[d] another unlawfully so as to interfere substantially with the other's liberty" and that "the victim was under the age of thirteen (13) at the time of the removal or confinement." Tenn. Code Ann. §§ 39-13-302, -305.

Viewing the evidence in the light most favorable to the State, appellant's action in physically picking up the victim and restraining him constitutes a substantial step toward the commission of the offense. Appellant argues that this act alone is insufficient to sustain his conviction because the restraint lasted for "less than five seconds" and did not constitute "major[,] consequential[,] or substantial" interference. However, both R.M. and M.M. testified that appellant only released M.M. following R.M.'s exercise of force against appellant. The record clearly establishes that M.M. was less than thirteen years of age at the time of the offense. Moreover, appellant's action in grabbing M.M. demonstrated that he intended to knowingly remove or confine M.M. in such a way as to substantially interfere

-9-

with his liberty. We conclude that appellant's action was sufficient to support the conviction for attempted especially aggravated kidnapping. Moreover, the jury, properly instructed, found the evidence to be sufficient, and we will not disturb the jury's verdict by re-weighing or re-evaluating the evidence. *Dorantes*, 331 S.W.3d at 379. Appellant is not entitled to relief.

## B. Trial Court's Jury Instruction on Intoxication

The trial court conferred with the parties prior to instructing the jury. The State noted that appellant did not request a jury instruction on intoxication and averred that appellant should not be permitted to argue intoxication as a defense in the absence of such a charge. Appellant, through counsel, maintained that because "intent" was an element of the crime, it would be "fair game" to argue that "maybe due to his intoxication[,] he couldn't form the intent. . . ." Counsel then stated, "Actually, I think intoxication as a defense might as well be charged. The whole case is about intoxication." Specifically, counsel explained that he was "not concerned with the charge of intoxication as a defense," but he "believe[d] it [was] fair game for [him] to argue to the jury [about] whether or not he could have formed . . . an intent to kidnap."

In light of the foregoing, the trial court instructed the jury as follows with regard to intoxication:

> Intoxication: Included in [appellant's] plea of not guilty is his plea of intoxication as a defense.

> You have heard evidence concerning the alleged intoxication of [appellant] at the time of the alleged offense.

> Intoxication itself is generally not a defense to prosecution for an offense. If a person voluntarily becomes intoxicated and, while in that condition, commits an act [that] would be a crime if he were sober, he or she is fully responsible for his conduct. It is the duty of persons to refrain from placing themselves in a condition [that] poses a danger to others.

> However, involuntary intoxication is a defense to prosecution if[,] as a result of the involuntary intoxication[,] the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law allegedly violated.

> . . . .

-10-

If evidence is introduced supporting the defense of involuntary intoxication, the burden is on the State to prove beyond a reasonable doubt that [appellant] was not involuntarily intoxicated.

If[,] from all the facts and circumstances[,] you find [appellant] was involuntarily intoxicated, or if you have a reasonable doubt as to whether [appellant] was involuntarily intoxicated, you must find him not guilty.

Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of [appellant] culpable mental state.

In this case, the State must prove beyond a reasonable doubt the required mental state of [appellant][,] which is intent. "Intent" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

If you find that [appellant] was intoxicated to the extent that he could not have possessed the required culpable mental statue, then he cannot be guilty of the offense charged.

If you are not satisfied beyond a reasonable doubt that [appellant] possessed the culpable mental state[,] then you must find him not guilty.

Appellant raises several issues with regard to this jury instruction.

## 1. Incomplete Charge

Appellant claims that although the trial court's instruction to the jury regarding intoxication was improper, the court should have "at least" given a complete charge. He claims that the trial court did not include the requisite mental state in its charge and only defined "intent" in general terms.

Appellant states that the pattern jury instruction for intoxication includes the language, "In this case, the State must prove beyond a reasonable doubt the required culpable mental state of [appellant], 'which is [insert definition of specific mental state required for charged and included offenses.]'" He advances that "[t]he specific intent required is that [he] intended to *knowingly* confine M.M. unlawfully . . . ." (emphasis added). In the intoxication charge, the trial court instructed the jury that an element of the offense of attempted especially aggravated kidnapping was the requisite mental state of "intent." It followed by

-11-

providing the statutory definition of "intent" as found in Tennessee Code Annotated section 39-11-106(a)(18).

We emphasize that appellant was charged with the *attempt* to commit especially aggravated kidnapping, not especially aggravated kidnapping itself. The statutorily-defined culpable mental state for criminal attempt is "intent." Tenn. Code Ann. § 39-12-101, Sent. Comm'n Cmts ("all three varieties [of criminal attempt] retain the traditional requirement of specific intent to commit an offense. Thus, a person must either intentionally engage in criminal acts or intend to accomplish a criminal result. This requirement is consistent with common law."). This court has reiterated:

> An attempt to commit a knowing or intentional act is a specific intent crime. An attempt, by nature, is a failure to accomplish what one intended to do. Attempt means to try; and it means an effort to bring about a desired result. The concept of attempt seems necessarily to involve the notion of an intended consequence, for when one attempts to do something[,] one is endeavoring or trying to do it. Hence, an attempt requires a desired, or at least an intended, consequence. The nature of an attempt, then, is that it requires a specific intent.

*State v. Thomas E. Bradshaw*, No. 01C01-9609-CR-00406, 1997 WL 578963, at *5 (Tenn. Crim. App. Sept. 19, 1997) (internal citation omitted). Thus, the trial court instructed the jury in accordance with the law.

Appellant also submits that the trial court's instruction on intent was "in general terms." The court read the precise definition as set forth in Tennessee Code Annotated section 39-11-106(a)(18). The footnote to the Tennessee Pattern Jury Instruction Criminal 2.08 states that the definition provided therein is a "rewording of the statutory definition of 'intentional,'" and the comment states that a trial court "*may* wish to use this definition in addition to, or instead of, the statutory definition." (emphasis added). As such, the trial court's definition of intent was complete and proper.

2. Voluntary Intoxication Instruction Was Not Warranted and Confused the Jury

At trial, counsel indicated his intent to argue that because of appellant's intoxication, he was unable to form the requisite intent. Appellant now argues that the voluntary intoxication charge was not warranted and could have only confused the jury.

Ample evidence was presented at trial that appellant was intoxicated. R.M. and M.M. testified that appellant appeared intoxicated. Law enforcement officers testified as to

appellant's confusion when trying to unlock his car door, his slurred speech, and his unsteadiness on his feet. The State presented proof that appellant's blood alcohol content was 0.24 when it was drawn, which occurred long after the initial contact between appellant and law enforcement officers. This court has held that "when the evidence establishes that a defendant was 'highly intoxicated[,]' a jury instruction will be warranted even without a special request." *State v. Ronald Duckett*, No. W2010-02158-CCA-R3-CD, 2012 WL 1524373, at *4 (Tenn. Crim. App. Apr. 30, 2012), *perm. app. denied* (Tenn. Sept. 19, 2012) (citing *Brown v. State*, 553 S.W.2d 94, 95-96 (Tenn. Crim. App. 1977)). Thus, the trial court properly instructed the jury on voluntary intoxication.

Appellant also submits that the trial court's instruction that "'intoxication itself is generally not a defense to prosecution for an offense' is an incorrect statement of the law." To the contrary, Tennessee case law holds that "[v]oluntary intoxication is not in itself a defense to prosecution, but it 'is admissible in evidence, if it is relevant to negate a culpable mental state.'" *Ronald Duckett*, 2012 WL 1524373, at *4 (citing Tenn. Code Ann. § 39-11-503(a)); *see Harrell v. State*, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979) (stating that "[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime"). Our jurisprudence belies appellant's argument.

Without citing any authority, appellant further complains that the intoxication charge improperly shifted the burden to him to prove that he lacked the requisite intent due to intoxication. The language of the instruction itself clarifies that the State had the burden of proving the requisite mental state of intent and that if the jury found appellant could not form the requisite intent due to intoxication, it must find him not guilty. This claim is without merit.

3. The Trial Court Erred in Instructing the Jury on Involuntary Intoxication

Appellant correctly notes, and the State agrees, that the evidence did not raise the question of involuntary intoxication. Rather, the record is silent as to how appellant became intoxicated. At worst, the trial court provided the jury with superfluous language concerning involuntary intoxication. We have previously held that "[p]roviding a definition . . . that contains superfluous . . . language is not 'an error of constitutional dimension when the instruction also includes the correct . . . definition.'" *Michael Blaine Ward, II v. State*, No. M2011-00122-CCA-R3-PC, 2012 WL 1417287, at *22 (Tenn. Crim. App. Apr. 20, 2012), *perm. app. denied* (Tenn. Sept. 18, 2012) (quoting *State v. Faulkner*, 154 S.W.3d 48, 59 (Tenn. 2005)). Any error in the inclusion of the involuntary intoxication charge is harmless.

## C. Sentencing Error

In his final issue, appellant contends that the trial court erred in sentencing him to eleven years for attempted especially aggravated kidnapping.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -210(b); Tenn. Code Ann. § 40-35-114. In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114; Tenn. Code Ann. § 40-35-210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination.

*Id.* at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Appellant limits his argument regarding the trial court's sentencing determination to the length of the eleven-year sentence it imposed for the conviction of attempted especially aggravated kidnapping. He concedes the propriety of the trial court's ruling regarding alternative sentencing.

The trial court found that appellant had a number of criminal convictions greater than that necessary to establish the appropriate range, that appellant had previously failed to comply with the conditions of sentence involving release into the community, and that appellant was on probation at the time he committed the offenses in the instant case. *See* Tenn. Code Ann. § 40-35-114(1), (8), (13)(C). Appellant advances no argument whatsoever that the trial court erred in finding these enhancement factors.

Although appellant did not argue this in the trial court, he asks this court to consider as a mitigating factor that his criminal conduct neither caused nor threatened serious bodily injury. *See* Tenn. Code Ann. § 40-35-113(1). Appellant attempted to forcibly kidnap a child, then drove his vehicle while three times more intoxicated than the legal limit. Had he been successful, he would have placed the victim and everyone on the roadway at risk. Thus, we decline to apply this factor.

Appellant correctly notes that the trial court's finding that confinement was necessary to avoid depreciating the seriousness of appellant's conduct and was particularly suited to provide an effective deterrence to others likely to commit similar offenses is not an enhancing factor. *See* Tenn. Code Ann. § 40-35-103(1)(B). Rather, it is clear from the record that the trial court considered enhancing factors first, then the sentencing considerations found in section 40-35-103, and finally the issue of consecutive sentencing. It was necessary for the trial court to consider the sentencing considerations because it ordered a sentence of full confinement, and appellant had requested a sentence of split confinement. The trial court did not apply this consideration as an enhancing factor.

Because the trial court sentenced appellant "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and

principles listed by statute," we uphold the sentence as imposed.  *See Bise*, 380 S.W.3d at 709-10.

## CONCLUSION

Upon our review of the record as a whole, the relevant legal authorities, the briefs of the parties, and the arguments of counsel, we discern no error and affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE